UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE GOOGLE ACCOUNT bragdonsteven5@gmail.com THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE LLC | No. 2:26-mj-310-KFW<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Jose G. Rodriguez-Aguilar, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since June 2022. I am currently assigned to the Boston Division, Portland Resident Agency, of the FBI. As part of my duties, I investigate crimes involving the sexual exploitation of minors, including the production, possession, and distribution of child pornography. I received training on the proper investigative techniques for these violations, including the use of surveillance techniques, undercover activities, and the application and execution of arrest and search warrants.

2. I make this affidavit in support of an application for a search warrant for information associated with account bragdonsteven5@gmail.com (hereinafter, the “SUBJECT ACCOUNT”) that is stored at premises owned, maintained, controlled, or operated by Google LLC (“Google”), an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheatre Parkway,

Mountain View, California, 94043. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me nor other law enforcement agents concerning this investigation.

4. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 2252A(a)(5)(B) and (b)(2) (possession of/access with intent to view child pornography) (collectively, the "TARGET OFFENSES"), have been committed by Steven BRAGDON. There is also probable cause to search the SUBJECT ACCOUNT described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of this crime further described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## TARGET OFFENSES

6. As noted above, this investigation concerns an alleged violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2), which prohibits a person from knowingly possessing or knowingly accessing with intent to view any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer, or attempting or conspiring to do so.

7. The term "child pornography" is defined in 18 U.S.C. § 2256(8). "Child pornography," as defined in 18 U.S.C. § 2256(8), includes: any visual depiction of a minor under the age of 18 years engaging in sexually explicit conduct. "Sexually explicit conduct" is defined in 18 U.S.C. § 2256(2) and includes actual or simulated sexual intercourse, whether genital-genital, oral-genital, anal-genital, or oral-anal, whether between members of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or the lascivious exhibition of the genitals, anus, or pubic area of any person. For investigative purposes, child pornography is commonly referred to as child

sexual abuse material or CSAM. For purpose of this affidavit, the terms CSAM, child sexual abuse material, and child pornography will be used interchangeably.

## SUMMARY CONCERNING CHILD PORNOGRAPHY, PERSONS WHO POSSESS AND COLLECT CHILD PORNOGRAPHY, AND HOW USE OF COMPUTERS AND THE INTERNET RELATES TO THE POSSESSION, RECEIPT, AND DISTRIBUTION OF CHILD PORNOGRAPHY

8. Based on my experience in child exploitation investigations and upon information provided to me by other law enforcement officers, I am aware that the following characteristics are common to individuals involved in child pornography offenses:

a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b. Such individuals may collect sexually explicit or suggestive materials, in a variety of media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child, or to demonstrate the desired sexual acts.

c. This type of material often includes what may be termed as child erotica or child exploitation material, which may consist of images or videos such as minors in lingerie or text writing involving sex with minors that do not rise

to the level of CSAM, but nonetheless fuel their deviant sexual fantasies involving minors. I am aware that this sort of material has been admitted in trials under Fed.R.Evid. 404(b) to prove such things as the possessor's knowledge, intent, motive, and identity to prove the person has a sexual interest in minors. I understand that they may upload or import (meaning transfer) this illicit imagery, including CSAM, onto multiple digital media devices and/or accounts so they can access such material readily to satisfy their prurient desires.

d. Such individuals may possess and maintain their copies of child pornographic material, that is, their pictures, films, videos, magazines, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain their pictures, films, video tapes, photographs, magazines, photographs, correspondence, mailing lists, books, tape recordings, and child erotica, etc. for many years.

e. Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer or cellphone, and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, or in online storage, email accounts or other online communication accounts, to enable the individual to view the collection, which is valued highly. Some of these individuals also have been found to download, view,

and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

f. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[1]

g. Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/collectors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses (including email addresses), and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

h. Individuals who would have knowledge on how to distribute and receive digital images of child pornography through the use of Peer-to-Peer networks and other online methods would have gained knowledge of its

[1] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774, 778 (7th Cir. 2012) (collecting cases, *e.g.*, *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); and *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)); *United States v. Morales–Aldahondo*, 524 F.3d 115, 119 (1st Cir.2008) (holding that a three-year lapse between the defendant's purchase of child pornography and the warrant application did not render the information stale because a special agent attested that those who download child pornography tend to retain images for years and use computers to augment and store collected images).

location through online communication with others with similar interests. Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images. Individuals who utilize these types of forums may be considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

i. Based on my training and experience, I know that such individuals may use their financial information to buy and sell child pornography online and purchase software used to make their online activity from law enforcement. For instance, individuals may purchase cryptocurrency such as Bitcoin to buy and sell child pornography online. The use of cryptocurrency provides a level of anonymity because it masks the user's identity when conducting online financial transactions and provides a means of laundering illicit proceeds. Financial information may provide a window into the identities of individuals seeking to buy or sell child pornography online by tying the illicit transactions back to the user. Financial information contained on an electronic device containing child pornography may also provide indicia of ownership. Further, based on my training and experience, I know individuals involved in the trafficking of child pornography may use sophisticated software, such as router configuration software, virtual private networks, proxy servers, cryptocurrency exchanges, or other anonymizing software, in conjunction with these illicit financial transactions to provide dual layers of anonymity

and prevent law enforcement detection. Financial information may indicate which services were purchased to obscure an individual's identity.

j. Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been consistently documented by law enforcement officers involved in the investigation of child pornography throughout the world.

9. Based on my investigative experience related to computer and internet related child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned the following:

a. Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. It has also revolutionized the way in which child pornography collectors interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To distribute these on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contact, mailings, and telephone calls. Any reimbursement would follow these same paths.

b. The development of computers, smartphones and the internet have added to the methods used by child pornography collectors to interact with and

sexually exploit children. Computers, smartphones, and the internet serve four functions in connection with child pornography. These are production, communication, distribution, and storage.

c. Smartphones have the capability to access the Internet and store information, such as videos and images. As a result, an individual using a smartphone can send, receive, and store files, including child pornography, without accessing a personal computer or laptop. An individual using a smartphone can also easily plug the device into a computer (via a USB cable) or connect with a computer via Bluetooth, and transfer data files from one digital device to another. Some smartphone users can and do create, communicate, upload, and download child pornography, and communicate with children to coerce them or entice them to produce child pornography or perform sexual acts, by using internet based social media or electronic service providers like Google, Instagram, Snapchat, or Apple (and many others).

d. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer – can store thousands of images or videos at very high resolution. It is easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage

devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

e. Child pornography can be transferred via electronic mail or through file transfer protocols ("FTP") to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), easy access to the Internet, and online file sharing and storage, the computer is a preferred method of distribution and receipt of child pornographic materials.

f. Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (i.e., by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such

as the traces of the path of an electronic communication, may also be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

h. In my recent investigative experience, as well as recent discussions with law enforcement officers, I know that individuals who collect child pornography are using email accounts, online storage accounts, and other online communications accounts to obtain, store, maintain, and trade child pornography with growing frequency, in addition to, or as an alternative to, the use of personal devices.

i. Based on traits shared by collectors, the use of email, online storage accounts, and other online communication accounts, and the increased storage capacity of computers and server space over time, there exists a fair probability that evidence regarding the possession of child pornography will be found in the SUBJECT ACCOUNT.

j. In addition, computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools.

**NCMEC CYBER TIPLINE**

10. The National Center for Missing and Exploited Children ("NCMEC") receives complaints via their Cyber Tipline from Internet Service Providers (ISPs), Electronic Service Providers (ESPs), and others. U.S. ESPs are required by U.S. federal law to report "apparent child pornography" to NCMEC via the Cyber Tipline (18 U.S.C. § 2258A) if they become aware of the content on their servers. Leads are reviewed by specially trained analysts, who examine and evaluate the reported content, add related information that may be useful to law enforcement, use publicly available search tools to determine the geographic location of the apparent criminal act, and ultimately provide all of the gathered information to the appropriate law enforcement agency for review and possible investigation.

11. The Cyber Tipline receives reports on the following type of criminal conduct: possession, manufacture and distribution of child pornography; online enticement of children for sexual acts; child prostitution; sex tourism involving children; child sexual molestation; unsolicited obscene material sent to a child; misleading domain names; and misleading words or digital images on the Internet.

12. The Cyber Tipline reports will vary in detail depending on the nature of the report, and which entity submits it. However, the reports will include any known information (1) relating to the identity of any individual who appears to have violated federal law by committing or attempting to commit the criminal conduct described above; (2) historical information on when or how a customer or subscriber of an ECS or RCS uploaded, transmitted, or received apparent child pornography; (3) geographical information on the involved individual or website, which may include the IP Address or verified billing address or geographic identifying information, including area code or zip

code; (4) any images of apparent child pornography; and (5) the complete communication containing any image of apparent child pornography. See 18 U.S.C. § 2258A(b). Cyber Tipline reports can be supplemented and made in connection with other Cyber Tipline reports.

**CASH APP**

13. Block Inc. ("Block") provides a money transmission product for non-commercial and commercial use known as Cash App. A Cash App account allows an individual to conduct electronic money transfers, funded by a linked debit card, bank account, credit card, physical cash or stored balance to other individuals and businesses. Cash App users may also use funds to purchase or sell Bitcoin ("BTC") and transact with other Cash App users peer-to-peer, or with external users via transactions on the blockchain or via the Lightning Network ("LN"), which is a second layer technology for faster BTC transactions.

**THE TOR NETWORK**

14. The DARK WEBSITE-1, further described below, operated on the Tor network, which is a computer network designed to facilitate anonymous Internet communication by routing communications through a globally distributed network of relay computers operated by volunteers. A user may access the Tor network via any computer or electronic device that has been configured to use Tor routing/software, to include computers, smartphones, or tablets. The most common method is to use the Tor web browser, which is preconfigured to access the network. The contents of a Tor user's communications are encrypted while the communication passes through the Tor network. Nevertheless, when a Tor user visits a website and requests content from the website server, the website server can still reliably transmit the requested content to the

Tor user's computer. Because of the way the Tor network routes communications through relay computers, traditional online investigative techniques are generally not effective.

15. Tor may be used to access open-Internet websites like www.justice.gov and to operate or access websites called "hidden services" or "onion services" that are accessible only to Tor users. Like other websites, hidden services are hosted on computer servers that communicate through IP addresses. However, hidden services have unique technical features that attempt to conceal the computer server's location.

16. A Tor web address is generally comprised of a series of 56 algorithm-generated characters, i.e., "asdlk8fs9dflku7fasdlk8fs9dflku7fasdlk8fs9dflku7fasdlk8fs," followed by the suffix ".onion." Unlike ordinary websites, there is no publicly available Domain Network Service "DNS" listing through which one can query the IP address of a Tor hidden service. So, while law enforcement agents can often view and access hidden services that are facilitating illegal activity, they cannot determine the IP address of a Tor hidden service computer server via public lookups.

## BACKGROUND CONCERNING GOOGLE[2]

17. Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google

[2] The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages: the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

18. In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

19. Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

20. Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

21. Google Photos and Videos is a photograph and video sharing and storage service for a broad range of Google products. Each user of a Google account can upload photos and videos to their Google Photos and Videos albums from many different devices.

22. Google Drive is a cloud-based storage product offered to every Google account where the user can store files that can be accessed from their browser or mobile

application. Users of a Google account can upload photos and videos to both their Google photos and videos storage but also to their Google drive storage account.

23. Gmail is a free, web-based email service provided by Google. It is accessible by a web browser or via a mobile application.

24. Google offers a free web browser service called Google Chrome which facilitates access to the Internet. Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access. If a user is logged into their Google Account on Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called My Activity.

25. My Activity also collects and retains data about searches that users conduct within their own Google Account or using the Google Search service while logged into their Google Account, including queries made to Google Gemini, "personal AI assistant," voice queries made to the Google artificial intelligence-powered virtual assistant Google Assistant or commands made to Google Home products. Google also has the capacity to track the websites visited using its Google Chrome web browser service, applications used by Android users, ads clicked, and the use of Google applications by iPhone users. According to Google, this search, browsing, and application use history may be associated with a Google Account when the user is logged into their Google Account on the browser or device and certain global settings are enabled, such as Web & App Activity. Google Assistant and Google Home voice queries and commands may also be associated with the account if certain global settings are enabled, such as Voice & Audio Activity tracking. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes them or opts

in to automatic deletion every three or eighteen months. Accounts created after June 2020 auto-delete Web & App Activity after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

26. Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

27. When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

28. Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including

whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

29. Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

30. In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. I believe that the data located within the SUBJECT ACCOUNT, specifically, the Google photos and videos storage and the Google drive storage, will likely reveal photos and video-based files that the account owner stored in a cloud-based storage account. I believe that the SUBJECT ACCOUNT likely stored Child Sexual Abuse Material (CSAM) in a cloud-based storage account.

31. Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

32. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

33. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

34. Other information connected to the use of a Google account may lead to the discovery of additional evidence. For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

35. Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services, specifically, Google Photos and Videos Storage content, My Activity, Google Drive and Gmail or Google Chat and Hangouts content. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

**PROBABLE CAUSE**

36. On or about July 17, 2026, Block filed Cyber Tipline Report #250737400 with NCMEC regarding a transaction made by a Cash App account that appeared to be for the purchase of child pornography. According to the report, on or about January 10, 2026, at 13:15:51 UTC, Cash App user "Stevenkickass" (C_g4exa8mpj), later identified as Steven BRAGDON, used his Cash App account to successfully conduct a BTC transfer withdrawal in the amount of 0.00020973 BTC, plus a fee, which is approximately $19 to benefit BTC wallet address "bc1qzv4jvwx75zlywkn5y45myu0jnyxl3rqzz6yrz5." As documented in the report and further set below, the BTC wallet ending in "6yrz5" was

determined to be in a cluster of wallets[3] owned by a known CSAM vendor hosted on the dark web ("DARK WEBSITE-1").[4]

37. The subject information provided by Block for BRAGDON in the Cyber Tipline report was as follows:

Name: Steven Bragdon
Address: 52 SABATTUS ST APT 3R
LEWISTON, ME 04240 US
Date of Birth: XX-XX-1984
Email Address: toll.jethro@yahoo.com
Screen/User Name: Stevenkickass
ESP User ID: C_g4exa8mpj

38. On or about July 22, 2026, pursuant to legal process submitted by the FBI, Block provided records associated with BRAGDON's Cash App account. These records included BRAGDON's full name, date of birth, and full social security number. Based on my knowledge and information provided by Cash App, I know that Cash App only provides date of birth and social security numbers for an account if that account has met Cash App's internal thresholds for identity verification.[5] Therefore, I know BRAGDON is

---

[3] A cluster is a group of cryptocurrency wallets which have been identified as belonging to the same individual or entity. A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses and types of virtual currency at the same time. There are various types of virtual currency wallets, including software wallets, hardware wallets, and paper wallets. The virtual currency wallets at issue for the purposes of this affidavit are software wallets (i.e., a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys).

[4] The name of DARK WEBSITE-1 as well as certain details regarding the websites and their users, are known to law enforcement but are not included here to protect operational security. Users of the DARK WEBSITE-1 and similar websites are often highly conscious of security and law enforcement activity. If the users of the DARK WEBSITE-1 learned of the investigative activity set forth in this affidavit, they could take steps to jeopardize the broader investigation, including by destroying evidence, changing patterns of behavior, alerting co-conspirators, and fleeing from law enforcement.

[5] To become a verified Cash App user, a user must provide his or her full legal name, date of birth, and the last four digits of his or her social security number. The user must then upload a clear photo of a government-issued ID, such as a driver's license or passport, and take a selfie-type photo for identity confirmation purposes. Cash App will then review a user's submission in order to make a final verification determination. If a user is verified, that user can spend from a Cash App balance, Cash App card, a linked bank account, or a linked debit card. If a user is unverified, that user can only spend from a linked debit card.

a verified Cash App user. Further, the records provided by Block included back and front photos of BRAGDON's Maine driver's license and a selfie-type photo of BRAGDON. BRAGDON's Maine driver's license confirmed his address in Lewiston, ME and his date of birth. Within the information obtained from Block, BRAGDON's phone number linked to his Cash App account was observed to be XXX-XXX-4234 and email address was observed to be "toll.jethro@yahoo.com".

39. The records provided by Block to the FBI included a list of financial instruments associated to BRAGDON's Cash App account, which included credit and/or debit cards that were linked to a bank account from "Ancorum Credit Union," to include cards ending in 3947, 5704, 5339, and 0201. The records also showed the completed BTC transaction from BRAGDON's Cash App account to the BTC wallet of DARK WEBSITE-1. The records included a list of devices BRAGDON used to access his account. Most of the devices were Android devices, to include a "moto g power (2021)," a "Galaxy A01", and an "Unknown Device." On or about January 17, 2026, BRAGDON used a "Browser," likely from a desktop or laptop computer, to access his Cash App account.

40. On or about August 2026, a Special Agent with the FBI's Virtual Currency Response Team conducted a review of BRAGDON's BTC transactions from his Cash App account. Through the date range of March 2025 through on or about July 07, 2026, Investigators located approximately 30 suspicious BTC transactions from BRAGDON's Cash App account to BTC wallets that were either flagged as belonging to a CSAM vendor or potentially flagged as related to a BTC wallet with overseas hosts that serve no legitimate purpose and are not traceable.

41. Of the transactions reviewed, the following transactions were found of payments from BRAGDON to known BTC wallets associated with DARK WEBSITE-1:

a. 01/10/2026 at 13:15:51 UTC, BRAGDON sent 0.00020973 BTC to wallet address ending in "6yrz5." Law enforcement tools associated this wallet address with DARK WEBSITE-1. The transaction hash for this transfer ends in "99bb0ee."

b. 01/24/2026 at 03:14:17 UTC, BRAGDON sent 0.00021216 BTC to wallet address ending in "j8t8f." Law enforcement tools associated this wallet address with DARK WEBSITE-1. The transaction hash for this transfer ends in "da79b6."

c. 02/09/2026 at 15:15:29 UTC, BRAGDON sent 0.00027409 BTC to wallet address ending in "tu2rpzp." Law enforcement tools associated this wallet address with DARK WEBSITE-1. The transaction hash for this transfer ends in "98047f99."

d. 03/07/2026 at 00:12:09 UTC, BRAGDON sent 0.00027851 BTC to wallet address ending in "f2e6gw9." Law enforcement tools associated this wallet address with DARK WEBSITE-1. The transaction hash for this transfer ends in "26fb118b."

42. On or about August 2026, legal process was submitted to Ancorum Credit Union for account information related to any accounts that are owned by BRAGDON. In September 2026, Ancorum Credit Union provided records related to the request. Within the records received, I located BRAGDON's bank statements. Within the bank statements, the transactions show that BRAGDON was funding his Cash App account through his Ancorum Credit Union bank account ending in "5203."

43. During a review of the records provided by Block to the FBI, IP Address information was not available within the records for the date and time of the suspected transaction reported to the Cyber Tipline on January 10, 2026. Investigators located IP Address entries of "67.242.57.88" within BRAGDON's Cash App account for the dates of January 08, 2026 at 8:53:48 PM UTC and January 12, 2026 at 6:51:43 PM UTC. Legal process was submitted to Charter Communications and subsequently received in August 2026 for the above-mentioned IP Address for the above-mentioned dates and times. Within the records obtained from Charter Communications, the records yielded that the subscriber of the internet account using that specific IP Address was BRAGDON at the his residence in Lewiston. The records from Charter Communications also yielded a phone number subscribed to BRAGDON of XXX-XXX-4234.

44. On or about August 2026, legal process was submitted to Google LLC for subscriber information for any account linked to the phone number ending in "4234." A return from Google LLC for the request yielded that email address Bragdonsteven5@gmail.com (SUBJECT ACCOUNT) was linked to phone number ending in "4234" and last verified on 08/29/2026.

45. On or about September 2026, legal process served to Google LLC for subscriber information for the email address of Bragdonsteven5@gmail.com (SUBJECT ACCOUNT). A return from Google LLC for the request yielded the following:

Name: "Steven kickass"
Created on: 11/16/2019
Last Login: 08/29/2026
Recovery Phone Number: XXX-XXX-4234
IP Logs resolve to Charter Communications
Google Pay: Steven William Bragdon, 52 Sabattus St. Apt 3R, Lewiston, ME (added 04/14/2025)
Device Attributed to Account: Samsung Chromebook 3

46. Google LLC return information also yielded that the account “Bragdonsteven5” had the following services enabled for the account: “Chromeos Login, Gmail, Web & App Activity, Location History, YouTube, Android, Google Play, Google Hangouts, Google Calendar, Google Payments, and Google Chat”. I am aware that all Google accounts come with free access to a Google Drive account and a Google photos and video storage account, to include 15 GB of free storage.

47. On or about July 2026, legal process was served to Yahoo Inc. for subscriber information related to Yahoo email address “toll.jethro@yahoo.com”. The data return from Yahoo Inc. yielded that the account held a recovery phone number of XXX-XXX-4234. I am aware that phone number ending in “4234” belongs to BRAGDON.

48. During March 2026 and September 2026, an undercover FBI agent visited DARK WEBSITE-1 and confirmed that the site was active and that the site hosted predominately CSAM videos. Upon law enforcement visiting the DARK WEBSITE-1, the landing page of the website consisted of a disclaimer notification to the end user. The landing page consisted of a CSAM image presented with the following statement: “Welcome to DARK WEBSITE-1, DARK WEBSITE-1 is a video streaming platform without any restrictions. This platform contains illicit sexual materials. If this is not what you are looking for, leave now! Please click continue to confirm.” Once the end user selects to continue, the website prompts for a username and password. Towards the bottom of the login, the website states “Don’t have an account? Sign up” and the “sign up” word contains a hyperlink to another webpage of the site where the end user is able to create a free account. Upon the end user creating an account and logging into the site, the DARK WEBSITE-1’s homepage is similar to that of YouTube. The site contains

thumbnails of videos that all appear to be CSAM. On the left-hand side of the site there is a menu that you can select different options such as "trending", "channels", "random video", "free videos", "bookmarked videos", and "#DARK WEBSITE-1 Chat." On the top of the site is a search bar, a notifications tab, and the end user's profile. Underneath the search bar, there is a row of menu items that consists of "videos", "categories", "chat", "upload", "wallet", "premium", and "join now."

49. A further review of DARK WEBSITE-1 yielded information that end users are able to make money off of videos that are posted onto the site. When the end user selects the menu tab for "wallet," the site informs the end user that they can earn $20.00 per 1000 views, and a status of their earnings account and "crypto balances."

50. When the end user selects on DARK WEBSITE-1 the "premium" tab, the site navigates to a landing page that is promoting DARK WEBSITE-1's premium account. The premium account advertises "unlimited downloads," "secure and private" downloads, "Priority access," and "No Download Limits." When selecting the payment method for a premium account, the end user is prompted to select from various payment methods that are exclusively crypto-based platforms, to include BTC, or the DARK WEBSITE-1's wallet belonging to the end user.

51. When the end user selects the menu tab of "join now," the site navigates to a landing page that displays different membership plans. A 7-day trial is advertised for $19, a monthly plan is advertised for $39, and a 3-month plan is advertised for $90. I am aware that the BTC transactions that BRAGDON conducted to the known BTC wallets of DARK WEBSITE-1 described in paragraph 41 of this affidavit, were all for similar amounts, approximately $19. Investigators observed that some of the videos within the site required a premium subscription in order to view the content.

52. During the September 2026 review of the DARK WEBSITE-1, Investigators located and observed CSAM content to include the following examples:

a. A video that is approximately 6 minutes and 07 seconds long, titled "preteen bath and blows dad." The video depicts a white female toddler who appears to be between the ages of 1 years old and 3 years old fully naked in a yellow bathtub while an adult white male sexually assaults her, to include vaginal and oral penetration.

b. A video that is approximately 15 seconds long, titled "hes teaching her." The video depicts a white minor female that appears to be under the age of 10, performing oral sex on an adult white male's erect penis while in a vehicle.

c. A video that is approximately 1 minute and 04 seconds long, titled "deep vaginal fuck with cumeshot." The video depicts a white minor female that appears to be under the age of 10, being vaginally penetrated by an adult white male's erect penis while laying on a bed.

***Background of BRAGDON*:**

53. A criminal history search of BRAGDON yielded: a 2014 conviction for possession of sexually explicit material of a minor under 12 and a 2016 conviction for visual sexual aggression against a child. The criminal history record further shows that BRAGDON violated his probation two separate times between 2016 and 2018 and also had his probation revoked during those times. BRAGDON is a current Maine tier-III lifetime registrant of the Maine Sex Offender Registry ("SORA"), with SORA #9374.

54. According to police reports, during the July 2013 investigation by the Maine State Police for BRAGDON that resulted in his conviction for possession of

sexually explicit material of a minor under 12, investigators interviewed BRAGDON at his residence at the time in Waterville, Maine. During the interview, BRAGDON granted investigators access into his home. BRAGDON admitted to investigators at the time that he was looking at child pornography. At the time, BRAGDON was using several computers in the basement of his home. BRAGDON admitted to investigators that he was using software programs named "Ares" and "ICOhumt" to search for child pornography, in addition to using external hard drives to store data. At the time of the interview, BRAGDON admitted to investigators that he viewed and downloaded child pornography to his computer for the purpose of masturbating to the images.

55. According to police reports, during the July 2016 investigation of BRAGDON that resulted in his conviction for visual sexual aggression against a child, a mother reached out to Waterville Police Department complaining that BRAGDON had been contacting her 12-year-old daughter. The victim alleged that BRAGDON was contacting her on social media and engaging in sexually explicit conversations and sent the victim a picture of his penis. BRAGDON was on probation at the time of this investigation.

***Execution of Federal Search Warrant and Identification of SUBJECT ACCOUNT***

56. During the execution of a federal search warrant for BRAGDON's residence, person, and vehicle (2:26-MJ-00294-KFW), law enforcement located a black in color Samsung laptop that appeared to be a "Chromebook" with serial number "0Q9T91KM8085728." This laptop was located in BRAGDON's bedroom near his bed, in a powered-on state and he was logged into the laptop. A live preview of the device yielded that the device was logged into a Google account with Gmail account

bragdonsteven5@gmail.com (SUBJECT ACCOUNT). Additionally, the Gmail account had a display name of "StevenKickass." Within the laptop's file explorer, law enforcement located the menu listed as "My Files" and a folder within the menu listed as "Misc." The folder labeled as "Misc" contained two video files. The following videos were located and observed within the folder:

57. Video number 1 was observed to be a video with file name "Young-gets-tip-fucked-girl-Hebephillia-softcore-white-full-quality." The video was approximately 15 minutes and 23 seconds in duration. The video appears to depict a white female that appears to be under 18 years old. The female is observed within the video to engage in various sexual acts with what appears to be an adult male, to include, oral sex and vaginal intercourse on a bed. The minor female's face is visible within the video and often exposes her genitals during the video. The video appears to be saved within the local file system of the device and would be accessible to the user of the laptop.

58. Video number 2 was observed to be a video with file name "Poppers-2-CPMV_girl_hardcore_mixed-pedophillia_full-quality." The video was approximately 4 minutes and 10 seconds in duration. The video appears to depict a compilation of many different child pornography videos that depict various kinds of different aged children to include children that appear to be under 12 years old. During the video compilation, I observed a brief video of what appeared to be an approximately 10-year-old white female that was fully naked, laying on her back with her vagina exposed, and using an elongated black and red object to vaginally masturbate. The video appears to be saved within the local file system of the device and accessible to the user of the laptop.[6]

[6] I am aware that the "preferred practice" in the First Circuit is that a magistrate judge view images that agents believe constitute child pornography by virtue of their lascivious exhibition of a child's genitals. *United States v. Brunette*, 256 F.3d 14, 17-19 (1st Cir. 2001) (affiant's "legal

59. During a live preview of the black Samsung Chromebook laptop, law enforcement also located an icon stored within the device that indicated that the user of the laptop accessed the TOR browser. Additionally, the device contained selfie-style images of BRAGDON, indicating that BRAGDON is the owner and operator of the laptop device.

60. After the above-described videos were located, BRAGDON was informed he was under arrest. BRAGDON was charged in a criminal complaint (2:26-mj-00295-KFW) with one count of possession of child pornography, in violation of Title 18, United States Code, Sections 2252A(a)(5)(B) and 2252A(b)(2).

61. The review of the black Samsung Chromebook laptop and other devices seized from BRAGDON's residence is ongoing.

62. Based on the aforementioned facts, I believe there is probable cause that evidence of the TARGET OFFENSES will be located on the Google Account, Google Drive, and Photos section of Bragdonsteven5@gmail.com (SUBJECT ACCOUNT). Additionally, I believe there is probable cause that BRAGDON likely used an internet enabled electronic device (i.e, Samsung Chromebook) to assist with the storage of CSAM on that same Chromebook and likely on internet-based cloud storage. Based on my knowledge and experience, Chromebooks are primarily manufactured in Taiwan, China,

conclusion parroting the statutory definition [...] absent any descriptive support and without an independent review of the images" insufficient basis for determination of probable cause). Here, however, the descriptions offered "convey to the magistrate more than [my] mere opinion that the images constitute child pornography." *United States v. Burdulis*, 753 F.3d 255, 261 (1st Cir. 2014) (distinguishing *Brunette*). Still frames from Video number 1 and Video number 2 were provided under seal as GOVERNMENT EXHIBITS ONE and TWO, in support of the issuance of the criminal complaint in this matter (Docket number 2:26-mj-00295-KFW), so the Court is free to review these previously submitted Exhibits in determining whether this warrant has specified sufficient probable cause.

India, Pakistan, and Vietnam. I am aware of no Chromebook products manufactured in the United States.

63. On or about September 24, 2026, the FBI submitted a preservation request to Google LLC for all account information related to Google account “Bragdonsteven5@gmail.com”.

## CONCLUSION

64. Based on the forgoing, I submit that there is probable cause to believe that the SUBJECT ACCOUNT described in Attachment A has been used to facilitate or commit violations of Title 18, U.S.C § 2252A(a)(5)(B) and (b)(2) (possession of/access with intent to view child pornography) (collectively, the “TARGET OFFENSES”), and that evidence of those criminal offenses will be located in the SUBJECT ACCOUNT. Further, I submit that such evidence, listed in Attachment B to this affidavit, constitutes contraband, the fruits of the crime, or things otherwise criminally possessed, or property which is or has been used as the means of committing the foregoing offenses.

65. Therefore, I respectfully request that the attached warrant be issued authorizing the search and seizure of the SUBJECT ACCOUNT, listed in Attachment A, for the evidence listed in Attachment B.

66. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Google. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

ATTESTED TO BY THE APPLICANT IN ACCORDANCE WITH THE REQUIREMENTS OF RULE 4.1 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE.

Respectfully submitted,

Jose G. Rodriguez-Aguilar
Special Agent
Federal Bureau of Investigation

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Oct 14 2026

City and state: Portland, Maine

*Judge's signature*

Karen Frink Wolf, U.S. Magistrate Judge
*Printed name and title*